**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH KLEMY, | ) | CASE NO. 1:25-CV-1276 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Sarah Klemy's application for Disability Insurance Benefits (DIB). Ms. Klemy seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents and Order, ECF No. 5.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Ms. Klemy's application for benefits.

## II.    PROCEDURAL HISTORY

In March 2023, Ms. Klemy applied to the Social Security Administration (SSA) seeking DIB.[1] (Tr. 161.) She claimed that she became disabled on July 1, 2022. (*Id.*) She identified four allegedly disabling conditions: (1) arthritis; (2) attention-deficit/hyperactivity disorder; (3) anxiety; and (4) depression. (Tr. 200.)

---

[1] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 33"). It will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1111").

The SSA denied Ms. Klemy's application initially and upon reconsideration. (Tr. 76–77, 88–89.) Ms. Klemy requested a hearing before an administrative law judge ("ALJ"). (Tr. 105.) The ALJ held a hearing on June 11, 2024, at which Ms. Klemy was represented by counsel. (Tr. 38–66.) An independent vocational expert also testified at the hearing. (*Id.*)

On June 21, 2024, the ALJ issued a written decision finding that Ms. Klemy is not disabled. (Tr. 12–33.) Ms. Klemy requested review of the ALJ's decision. (Tr. 156–57.) On April 25, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On June 19, 2025, Ms. Klemy filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Klemy asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ's evaluation of Ms. Klemy's mental health impairment is internally inconsistent and, therefore, reflects an inaccurate assessment of her mental limitations.
>
> **Second Assignment of Error:** The ALJ failed to properly evaluate and analyze Ms. Klemy's pain and symptoms under SSR 16-3p.
>
> **Third Assignment of Error:** The ALJ failed to account for the issue of sustainability in her residual functional capacity determination.

(Pl.'s Merit Br. at 10, 13, 15, ECF No. 9, PageID# 1111, 1114, 1116.)

## III.  BACKGROUND

### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Klemy was born in November 1991 and was 31 years old on the date of her application. (*E.g.*, Tr. 161.) She obtained her GED. (Tr. 44.) She took some college classes but was not able to complete her degree; she attributed this to anxiety, among other things. (*See* Tr. 44.)

Ms. Klemy lives with her wife in her father-in-law's house. (Tr. 44–45.) She has a driver's license and is able to drive. (Tr. 45.)

Ms. Klemy last worked in 2022 as a customer service representative, a job that she held for less than a year. (Tr. 45–46.) She also has experience as an emergency dispatcher, as a manager and cook in a fast food restaurant, and as a customer service representative at a department store. (Tr. 46–49.)

**B.      Function Report**

In seeking reconsideration of the initial denial of her application, Ms. Klemy wrote to the Agency that she "[n]eeds a lot of help," including getting dressed and bathing. (Tr. 224.) She wrote that she cannot see to her own hygiene after using the restroom. (*Id.*) She wrote that she cannot do laundry and "[w]aits in the car while her wife grocery shops." (*Id.*)

**C.      Relevant Hearing Testimony**

**1.      *Ms. Klemy's Testimony***

Ms. Klemy testified that she was terminated from her last job. (Tr. 52.) She explained that she found herself frequently using the restroom due to anxiety, and she said that her psoriatic arthritis made it "extremely painful" for her to sit for as long as was required in the job. (*Id.*)

Ms. Klemy said that her anxiety, depression, and arthritis cause her to be fatigued. (Tr. 53.) She has trouble concentrating and finds it hard to remember tasks. (*Id.*) She takes frequent trips to the restroom. (*Id.*) She has arthritis pains from her shoulders to her legs, where the pain is "overwhelming." (*Id.*) She is not able to be on her feet all day, and it is also difficult to sit for long periods of time. (*Id.*)

Ms. Klemy testified that she gets overwhelmed easily and has anxiety attacks. (Tr. 54.) She gets "really anxious" when she thinks about being around other people. (*Id.*)

Ms. Klemy needs help with getting dressed and using the restroom. (Tr. 54.) She cannot cook unless she uses a walker to sit, and even then she needs assistance. (Tr. 54–55.) Her wife shops for groceries and household supplies; Ms. Klemy will drive her to the store. (Tr. 55.) Ms.

3

Klemy's wife cooks. (*Id.*) Ms. Klemy is able to do "very minimal dishes," but she cannot bend and she cannot stand for long. (Tr. 55–56.) Ms. Klemy's father-in-law takes care of outdoor chores. (Tr. 56.)

Ms. Klemy described that, on a typical day, she will lie in bed all day. (Tr. 56.) Sometimes she and her wife will go see a movie, or go to the park, and her wife will push her in a wheelchair. (*Id.*) Ms. Klemy used to enjoy writing, but now she cannot write for long without experiencing "tremendous wrist pain." (*Id.*; *see also* Tr. 58.) Typing is also difficult. (Tr. 58.)

Ms. Klemy estimated that she had been using a wheelchair for six months. (Tr. 57.) She also uses a rollator walker. (*Id.*) She had previously used a cane since late 2020 or early 2021. (*Id.*) None of those assistive devices were prescribed by a doctor. (Tr. 58.)

Ms. Klemy has difficulty picking items up; she finds herself dropping things. (*Id.*) She cannot lift a gallon of milk comfortably. (Tr. 59.)

Ms. Klemy said that her methotrexate medication makes her nauseous. (Tr. 59.)

### 2. *Vocational Expert's Testimony*

Roxanne Benoit testified as a vocational expert ("VE") at the hearing. (Tr. 38.) The VE characterized Ms. Klemy's past relevant work of that of a dispatcher (DOT 379.362-050), cook helper (DOT 317.687-010), and customer service representative (DOT 239.362-014). (Tr. 60–61.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Klemy's age, education, and work experience is capable of lifting, carrying, pushing, and pulling items up to 10 pounds frequently and items up to 20 pounds occasionally. (Tr. 61–62.) The individual can stand or walk for four hours in an eight-hour workday and can sit for six hours. (Tr. 62.) They can occasionally climb ramps and stairs but should never climb ladders, ropes, or scaffolds. (*Id.*) They can frequently balance and occasionally stoop, kneel, crouch, and crawl. (*Id.*) They can perform frequent bilateral handling and fingering. (*Id.*) They can occasionally be exposed to "hazards and

4

heights." (*Id.*) They are limited to the performance of simple routine tasks and occasional routine workplace changes, and they can have occasional interaction with the public. (*Id.*)

The VE testified that such a person could not perform Ms. Klemy's past relevant work but could perform the work of an inspector and hand packager, routing clerk, or marker. (Tr. 62–63.) The VE testified that they hypothetical person, if limited to sedentary work, could perform the work of a touch-up screener, inspector, or final assembler. (Tr. 63.)

The VE testified that there would be no competitive employment available to a person who is off task for 15 percent of the workday on an ongoing and consistent basis. (Tr. 64.) The VE said that employers will tolerate up to 10 percent and will accept up to one absence per month. (*Id.*)

### D.  State Agency Consultants

A disability examiner (Beth Aulette), a physician (Jerry Davis, M.D.) and a psychologist (Erika Gilyot-Montgomery, Psy.D.) reviewed Ms. Klemy's claim at the initial review level. (Tr. 67–77.)

Dr. Davis opined that Ms. Klemy would be able to occasionally lift and carry up to 20 pounds and could frequently lift and carry up to 10 pounds. (Tr. 71.) Dr. Davis said Ms. Klemy could stand or walk for four hours and could sit for six hours out of an eight hour workday. (Tr. 72.) Dr. Davis limited Ms. Klemy to occasional climbing of ramps and stairs and occasional stooping, kneeling, crouching, and crawling. (*Id.*) She could frequently balance but must never climb ladders, ropes, or scaffolds. (*Id.*) Dr. Davis wrote that Ms. Klemy should avoid concentrated exposure to hazards like machinery and heights. (*Id.*)

Dr. Gilyot-Montgomery opined that Ms. Klemy has a mild limitation in her ability to understand, remember, and apply information and moderate limitations in her ability to interact with others, to adapt and manage herself, and to concentrate, persist, and maintain pace. (Tr. 70.) Dr. Gilyot-Montgomery further wrote that Ms. Klemy had benefitted from medication and was

5

independent with self-care and routine daily tasks. (Tr. 75.) The doctor noted that Ms. Klemy's mental status examinations were within normal limits. (*Id.*) Dr. Gilyot-Montgomery opined that Ms. Klemy is able to concentrate, persist, keep pace, and adapt to the demands of work that would involve two- to three-step tasks in a 40 hour work week with "mild workplace pressures and changes and superficial social interaction." (*Id.*)

The consultants determined that Ms. Klemy could perform the work of a type copy examiner (DOT 979.687-026), lacer (DOT 774.687-014), or painter (DOT 735.687-018). (Tr. 76.)

Based on these conclusions, the agency consultants found that Ms. Klemy was not disabled. (*Id.*)

A disability examiner (Danielle Yenni), a physician (Elizabeth Das, M.D.), and a psychologist (Shannon Ratzburg, Psy.D.) reviewed Mr. Lozancic's claim at the reconsideration level. (Tr. 78–89.)

Dr. Das opined that the initial-level findings "continue to be supported by and consistent with" the record evidence. (Tr. 85.) Dr. Das limited Ms. Klemy to avoid even moderate exposure to hazards like machinery heights. (*Id.*) And Dr. Das limited Ms. Klemy to only frequently handling and fingering bilaterally, to account for limitations stemming from Ms. Klemy's arthritis in the hand and wrist. (Tr. 84.)

Dr. Ratzburg similarly opined that the initial-level findings were supported by and consistent with the record. (Tr. 87.) Dr. Ratzburg wrote that Ms. Klemy would benefit from a position that would involve infrequent contact with the public and infrequent changes. (Tr. 86–87.)

Based on these opinions, the consultants affirmed that Ms. Klemy could perform the work of a type copy examiner, lacer, or painter. (Tr. 88.) The consultants affirmed that Ms. Klemy was not disabled. (*Id.*)

E.      **Relevant Medical Evidence**

Ms. Klemy began consulting with rheumatologist Maria Antonelli, M.D., in August 2021. (Tr. 853.) Ms. Klemy reported that she had been diagnosed with arthritis when she was 18 and her condition had gotten worse over the past two years. (*Id.*) Ms. Klemy said that her knees were "very bad all the time," the pain was "now very bad" in her fingers, and her feet hurt such that it was hard for her to stand. (*Id.*) She said that she needed help for essentially all of her activities of daily living. (*Id.*)

On examination, Ms. Klemy presented with tenderness in the shoulders, wrists, hands, hips, knees, ankles, and feet. (Tr. 854.) She had psoriasis plaques with mild to moderate scale on her knee, scalp, ears, cheeks, and neck. (*Id.*) She had decreased range of motion in her elbows, wrists, hands, hips, and knees. (*Id.*) Her mood, affect and memory were normal, and she exhibited cooperative behavior. (Tr. 855.)

Dr. Antonelli started Ms. Klemy on a nonsteroidal anti-inflammatory drug and ordered laboratory tests; the plan was for Ms. Klemy to start on methotrexate if the tests came back normal. (*Id.*)

At a mental health assessment in August 2021, Ms. Klemy reported that she had been diagnosed with attention-deficit/hyperactivity disorder ten years ago. (Tr. 834.) She complained of depression symptoms, including fatigue and difficulty concentrating. (*Id.*) She said that when she is off medication, she cries a lot and does not "want to do anything but watch TV." (*Id.*) She described feeling restless and endorsed difficulty concentrating and finishing tasks. (*Id.*)

On examination, Ms. Klemy presented with a euthymic mood and exhibited cooperative behavior and sustained concentration. (Tr. 838.) It was noted that Ms. Klemy was in a wheelchair. (*Id.*) It was decided that Ms. Klemy would begin receiving outpatient psychiatric treatment for ADHD. (Tr. 838–39.)

Ms. Klemy underwent x-ray imaging of her chest in September 2021 after complaining of shortness of breath with her primary care provider. (*See* Tr. 500.) The technologist noted that Ms. Klemy was unable to stand for the imaging, so the imaging was "[d]one in wheelchair." (*Id.*) Ultimately, the imaging was normal. (*E.g.*, Tr. 776.)

Ms. Klemy submitted a note to her providers on September 17, 2021, stating that her pain had been "getting worse" since she stopped taking ibuprofen and reporting that acetaminophen was not helping. (Tr. 775.)

By November 2021, Dr. Antonelli noted that Ms. Klemy's psoriatic arthritis symptoms had shown a "minimal response to methotrexate alone." (Tr. 742.) The plan was to seek prior authorization to begin Ustekinumab. (*See id.*) Dr. Antonelli also ordered x-ray imaging. (*Id.*)

Imaging of the spine revealed "slight" narrowing of the disc spaces from the L1 to S1 vertebrae "secondary to mild degenerative arthritis," "slight" scoliosis and narrowing of the facets from L4 to S1 secondary to degenerative facet arthropathy, and narrowing of the sacroiliac joints. (Tr. 478.) The radiologist noted that the narrowing of the SI joints could have resulted from chronic inflammatory arthritis, so psoriatic arthropathy could not be excluded. (*See id.*) In the cervical spine, there was "slight" reversal of lordosis but no significant bone abnormality or subluxation. (Tr. 485.)

Imaging of the elbows revealed mild osteoarthritis in the ulnotrochlear joints with elbow joint effusion in both arms. (Tr. 480, 489–90.) There was mild osteoarthritis in the right proximal radioulnar joint and mild osteopenia in the left arm. (*Id.*)

Imaging of the hands and wrists revealed osteopenia and bilateral radiocarpal joint space narrowing, which the radiologist described as a "nonspecific arthropathic finding" that may be seen with degenerative arthritis or inflammatory arthritis. (Tr. 481.)

Imaging of the knees revealed osteoarthritis bilaterally, more prominently on the left. (Tr. 483.) There was also large, nonspecific fluid collection in the right knee. (*Id.*)

Imaging of the feet revealed mild osteopenia bilaterally. (Tr. 486, 488.) There was mild soft tissue swelling in the left foot. (Tr. 486.) And there was a small posterior heel spur in the right foot. (*See* Tr. 488.)

Ms. Klemy consulted with Joy Sedlock, APRN-CNP, for mental health treatment on December 8, 2021. (Tr. 665.) She complained of depressive symptoms, anxiety and panic attacks, trouble sleeping and concentrating, and a sense of detachment. (*Id.*) On examination, Ms. Klemy presented with a euthymic mood and full affect; she displayed sustained concentration and was cooperative. (Tr. 669.) She was continued on her medication, which Ms. Sedlock wrote had been "somewhat helpful." (Tr. 668, 670.)

In February 2022, Dr. Antonelli noted that Ms. Klemy's psoriasis symptoms were improving on the Ustekinumab and that celecoxib "definitely helps." (Tr. 649.) Ms. Klemy described continued difficulty with mobility and joint pain. (*Id.*) She said that she uses a wheelchair when she is "out and about" but not at home. (*Id.*) She denied depression. (*Id.*) Dr. Antonelli continued her on her medication. (Tr. 652.) Dr. Antonelli offered to refer Ms. Klemy to a pain management professional, but Ms. Klemy declined. (*Id.*) Dr. Antonelli wrote that deconditioning was "likely playing at least some role" in Ms. Klemy's condition; Dr. Antonelli discussed physical and occupational therapy, with the goal to become independent in activities of daily living before working toward the larger goal of "being fully independent." (Tr. 653.)

At an appointment with Ms. Sedlock in April 2022, Ms. Klemy described her mood as "neutral" but reported continued trouble sleeping and complained of low energy, motivation, and concentration. (Tr. 639.) On examination, Ms. Klemy was cooperated and exhibited a euthymic

mood with full affect. (Tr. 641.) She displayed sustained concentration and attention and good judgment and insight. (*Id.*) Ms. Sedlock also noted that Ms. Klemy physically moved well without assistance. (*Id.*)

Ms. Klemy consulted with Dr. Antonelli on June 6, 2022. (Tr. 316.) On examination, Ms. Klemy's gait was intact. (Tr. 318.) Dr. Antonelli continued to note tenderness and decreased range of motion in the right elbow and in the wrists. (*Id.*) There was swelling and tenderness in the hands. (*Id.*) Dr. Antonelli noted that Ms. Klemy's psoriasis had "improved but not completely," noting poorly controlled back and peripheral joint pains, Achilles tendonitis, left troch bursitis, and persistent finger swelling. (Tr. 320.) Dr. Antonelli wrote that Ustekinumab had "fail[ed]" and sought prior authorization to start Ms. Klemy on secukinumab. (*Id.*) Dr. Antonelli noted that she suspected that fibromyalgia may be "playing a role" in Ms. Klemy's condition. (*See id.*)

Ms. Klemy met with Ms. Sedlock on July 8, 2022. (Tr. 303.) Ms. Klemy said she was "a little stressed but otherwise fine." (Tr. 304.) She complained of continued difficulty sleeping, low concentration, mood, and energy, and irritability. (*Id.*) She rated her physical pain as a seven out of ten. (Tr. 306.) She said that her concentration and motivation had improved with lisdexamfetamine (Vyvanse). (Tr. 304.) On examination, Ms. Sedlock noted that Ms. Klemy had come to the appointment in a wheelchair. (Tr. 305.) Ms. Sedlock observed that Ms. Klemy's shoulders and back were twitching. (*Id.*) Ms. Klemy had a depressed and anxious mood with a constricted affect; she reported difficulty with concentration and memory. (*Id.*) Ms. Sedlock continued Ms. Klemy on her SSRI medication, started her on propranolol, and increased the dosage of her Vyvanse. (Tr. 309.)

At an appointment on September 12, 2022, Dr. Antonelli noted improvement on secukinumab, both to Ms. Klemy's skin and joints. (Tr. 293.) Ms. Klemy was able to wear a ring

on her finger, which was a "new and big thing." (*Id.*) But there was still some swelling in her fingers. (*Id.*) Ms. Klemy was sleeping better on the propranolol. (*Id.*) On examination, there continued to be swelling and decreased range of motion in the elbows, wrists, hands, and knees. (Tr. 294.) There was deformity and tenderness in the wrists and hands. (*Id.*) And there was swelling and tenderness in the feet. (*Id.*) But Ms. Klemy's gait was intact, and her mood, affect, and memory were normal. (*Id.*) Dr. Antonelli increased the dose of methotrexate and celecoxib and continued Ms. Klemy's other medications. (Tr. 297.) Ms. Klemy declined physical and occupational therapy, despite Dr. Antonelli's concerns about deconditioning. (*See id.*)

Ms. Klemy began treating with Marcelle Maslowski, APRN-CNP, in September 2022 with regard to her mental health. (Tr. 287.) Ms. Klemy reported low mood since losing a job two weeks before. (*Id.*) She complained of fatigue and endorsed a depressed mood, feelings of worthlessness, irritability, and other depression symptoms. (Tr. 287, 289.) She had no symptoms of panic attacks. (Tr. 289.) She complained of physical pain in her legs, hands, and back, which she rated at a five out of ten. (*Id.*) She said that she "[p]lays pokemon 12 hours per day" to relax. (Tr. 287.)

On examination, Ms. Klemy was in a wheelchair. (Tr. 290.) She presented with a depressed mood but showed cooperative behavior, a full affect, sustained attention and concentration, normal memory, and good insight and judgment. (*Id.*) Ms. Maslowski diagnosed Ms. Klemy with ADHD, anxiety, insomnia, and depression, and she continued Ms. Klemy on her current medication regimen. (Tr. 290.)

At her next appointment with Ms. Maslowski on December 16, 2022, Ms. Klemy reported that she had been doing better but was irritable and very anxious recently. (Tr. 273.) She said that she had not felt depressed "so much" but was "extremely anxious" due to life stressors like applying for disability benefits and navigating bankruptcy and a recent change in housing. (*See*

11

*id.*, Tr. 277.) Ms. Klemy refused a referral to psychotherapy and said that she continued to play Pokémon. (Tr. 273.) She plays "til [her] hands hurt." (*Id.*) Ms. Klemy felt that the propranolol and Vyvanse had been helping. (*Id.*) Ms. Klemy's mental status examination was not materially different than at her last appointment. (Tr. 276.) Ms. Maslowski increased the dose of Ms. Klemy's SSRI medication and started her on an anti-anxiety medication (buspirone). (Tr. 278.)

Ms. Klemy next met with Ms. Maslowski in March 2023. (Tr. 265.) Ms. Klemy reported that there was still a "lot going on" for her, including the death of a pet and navigating the work to apply for disability and bankruptcy. (*Id.*) She described that she is "stressed all the time" and said she could not get motivated, was increasingly irritable, and could not even sit at the computer long enough to fill out a form. (*Id.*) She said that she plays video games and reads, and she reported no trouble sleeping. (*Id.*) On examination, her mental status was largely unchanged except that she presented with a depressed and anxious mood. (Tr. 267–68.) Ms. Maslowski increased the dosage of her anti-anxiety medication, her SSRI, and her propranolol. (Tr. 269.)

On May 25, 2023, Ms. Klemy underwent a consultative examination with Dariush Saghafi, M.D., for purposes of her disability application. (Tr. 862–68.) Ms. Klemy reported that she could walk for only up to five minutes, using a cane. (Tr. 862.) She complained of joint pain and said that she needs assistance bathing, using the restroom, and dressing. (*Id.*) She said her pain "never really goes away completely," although pain medication lessens the pain. (*Id.*) She rated her pain at a three out of ten. (*Id.*)

On examination, Ms. Klemy was able to ambulate out of her wheelchair "without much assistance." (Tr. 863.) Dr. Saghafi noted that she was able to walk from her wheelchair in the waiting room to the examination room, "relatively easily." (Tr. 868.) She was also able to climb onto the examination table relatively easily. (*Id.*) But Dr. Saghafi noted that she walked with a

12

"slow hunched over gait," leading to a "predisposition to falls due to unsteadiness." (Tr. 864.) Ms. Klemy was observed to be "morbidly obese," and Dr. Saghafi confirmed that arthralgias and the presence of dermal lesions were indicative of psoriatic arthritis. (*Id.*) Dr. Saghafi evaluated that Ms. Klemy had full strength and range of motion in her arms, legs, hips, thighs, knees, and ankles. (Tr. 863–64, 866–68.) He opined that Ms. Klemy was able to lift, push, and pull sufficiently to be able to perform activities of daily living. (Tr. 864.) She is able to bend, walk, and stand, as well as understand the environment and communicate with peers. (*Id.*) Dr. Saghafi noted that Ms. Klemy displayed "good fine manipulative movements and enough grip strength of the hands" to perform activities of daily living. (Tr. 866.) He assessed that she was articulate and had no difficulty with comprehension; she displayed normal short term memory. (Tr. 863.)

Ms. Klemy reported that she had "been OK" at her appointment with Ms. Maslowski in June 2023. (Tr. 878.) She said her sleeping was "not great" but said she was "[g]ood on what [she is] on right now." (*Id.*) Her mental status examination was unchanged from the previous appointment. (Tr. 881.) She was continued on her medication. (Tr. 883–84.)

At a follow-up appointment in July of 2023, Ms. Klemy complained of persistent shortness of breath with activity. (Tr. 870.) Dr. Antonelli wrote that Ms. Klemy's pain was "50% controlled" on medication, with Ms. Klemy complaining of mild pain in the days leading up to her secukinumab administration. (*Id.*) On examination, Ms. Klemy had deformity and tenderness in the wrists and right hand, tenderness in the left hand, and welling and decreased range of motion in the knees. (Tr. 872.) There was tenderness in the ankles, swelling in the feet, and dactylitis in the left foot. (*Id.*) Dr. Antonelli noted the "partial response" to treatment for both psoriatic and inflammatory arthritis, and she increased the dosage of Ms. Klemy's methotrexate, celecoxib, and secukinumab. (Tr. 873–74.)

During a November 2023 visit with Ms. Maslowski, Ms. Klemy reported that she was not sleeping well but said her mood had been "OK" (Tr. 919). Ms. Klemy's wife reported several life stressors and said that Ms. Klemy's concentration was worse (*Id.*) On examination, Ms. Maslowski noted that Ms. Klemy was in a wheelchair. (Tr. 922.) Ms. Klemy presented with a depressed and anxious mood but displayed sustained concentration and normal memory and insight. (*Id.*) Ms. Maslowski increased the dosage of several medications and started Ms. Klemy on topiramate. (Tr. 924–25.)

A January 2024 video visit with primary care physician Kristin Kranz, M.D., was routine. (Tr. 1022–27). Dr. Kranz ordered a thyroid ultrasound to follow up on thyroid nodules. (Tr. 1022.) Ms. Klemy complained of a lingering cough following a December 2023 COVID infection. (*Id.*)

Ms. Klemy began treating with Susan Ensch, LSW, for psychotherapy in January 2024. (Tr. 1018.) Ms. Klemy said that she had low frustration tolerance and desired to regulate her emotions. (*Id.*) She complained of chronic pain and said she was "never pain free." (Tr. 1014.) On examination, Ms. Klemy had a depressed mood and flat affect. (Tr. 1015.)

On January 31, 2024, Ms. Klemy followed up with Ms. Maslowski. (Tr. 1005.) She said that her recent counseling session had provided "good relief." (*Id.*) But she said she was sleeping "extra" and her mood "could be better." (*Id.*) She continued to experience pain in her legs, hands, and back, which she rated as a five. (Tr. 1007.) On examination, Ms. Klemy had a depressed mood and blunt affect. (Tr. 1008.) Ms. Maslowski continued her existing medications, increased buspirone, and added bupropion. (Tr. 1011.)

Ms. Klemy met with Ms. Ensch for counseling three times in February 2024. (Tr. 993–1004.) Ms. Klemy said that she was in control of her anger, although she found herself "go[ing] from numb to anger all the time." (Tr. 993.) She was overwhelmed at times and continued to have

14

difficulty sleeping. (*Id.*) She was listening to audiobooks and playing games. (*Id.*, Tr. 997, 1001.) She often presented with depressed mood and constricted affect, but she was cooperative with good judgment and sustained concentration. (Tr. 994, 998, 1002.)

Ms. Klemy attended counseling with Ms. Ensch in March 2024. (Tr. 980, 1062, 1066.) She continued to report poor sleep, and she discussed life stressors. (*Id.*) On one occasion Ms. Klemy said she was having trouble getting into and out of her wheelchair. (Tr. 1066.) Mental status examinations were materially unchanged from February. (Tr. 981–82, 1063, 1067.)

Ms. Klemy continued meeting with Ms. Ensch in April 2024. She described having dreams of being chased. (Tr. 1050, 1058.) She said she was in pain from her arthritis and worries about her family. (Tr. 1050.) She said that driving "stresses her out" and she does not like being under bridges. (Tr. 1054.) Her mental status examinations were largely unchanged, although she was "sounding less depressed" at one appointment. (Tr. 1051, 1059.)

In March 2024, Ms. Klemy participated in a telephone counseling appointment with Ms. Ensch. (Tr. 1046.) Ms. Klemy sounded depressed, but Ms. Ensch noted that she was cooperative with sustained concentration and normal memory and judgment. (Tr. 1047.) Ms. Ensch continued Ms. Klemy on the same treatment plan. (Tr. 1048.)

During a May 2024 video visit with Ms. Maslowski, Ms. Klemy said that her mood "could be better" but "it[']s been worse." (Tr. 1038.) She was still having trouble sleeping. (*Id.*) On examination, she had a depressed mood with a blunt affect, but she was cooperative and displayed sustained concentration and logical thought processes. (Tr. 1041.) Ms. Maslowski increased the dose of Ms. Klemy's bupropion and topiramate. (Tr. 1044.)

## IV.    THE ALJ'S DECISION

The ALJ found that Ms. Klemy met the insured status requirements of the Social Security Act through March 31, 2026. (Tr. 17.) The ALJ further found that Ms. Klemy had not engaged in

substantial gainful activity since July 1, 2022, the alleged onset date. (*Id.*)

The ALJ next determined that Ms. Klemy had the following severe impairments: (1) inflammatory arthritis/psoriatic arthritis; (2) osteoarthritis of the bilateral knees and elbows; (3) degenerative disc disease of the lumbar spine; (4) obesity; (5) anemia; (6) depressive disorder; (7) anxiety disorder; and (8) attention-deficit/hyperactivity disorder. (Tr. 18.)

The ALJ then concluded that none of Ms. Klemy's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. Klemy had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 22.)

With respect to exertional and environmental limitations, Ms. Klemy can lift, carry, push, and pull up to 10 pounds frequently and up to 20 pounds occasionally. (*Id.*) She can stand or walk for four hours out of an eight-hour workday. (*Id.*) She can sit for six hours of the workday. (*Id.*) She can occasionally climb ramps and stairs bust should never climb ladders, ropes, or scaffolds. (*Id.*) She can frequently balance. (*Id.*) She can occasionally stoop, kneel, crouch, and crawl. (*Id.*) She can frequently engage in bilateral handling and fingering. (*Id.*) She can occasionally be exposed to the hazard of unprotected heights. (*Id.*)

With respect to non-exertional limitations, Ms. Klemy is limited to simple, routine tasks. (*Id.*) She can have occasional interaction with the public. (*Id.*) And she is limited to occasional routine workplace changes. (*Id.*)

The ALJ concluded that Ms. Klemy was unable to perform her past relevant work as a dispatcher, cook helper, or customer service representative. (Tr. 31.) The ALJ found that Ms. Klemy was 30 years old on the alleged disability onset date and had a high school education. (*Id.*)

16

The ALJ then determined that—considering Ms. Klemy's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as an "inspector and hand packager" (DOT 559.687-074), "routing clerk" (DOT 222.687-022), "marker" (DOT 209.587-034), "circuit board assembler" (DOT 726.684-110), "inspector" (DOT 669.687-014), or "final assembler" (DOT 713.687-018).[2] (Tr. 32.) Accordingly, the ALJ concluded that Ms. Klemy was not disabled. (Tr. 33.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

---

[2] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.    Standard for Disability

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or

mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially

19

when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

### C.    Analysis

#### 1.    Evaluation of Ms. Klemy's Mental Health Impairments

In her first assignment of error, Ms. Klemy argues that the ALJ's analysis with respect to her mental health impairment is "internally inconsistent and unsupported by the record." (Pl.'s Br. at 10, ECF No. 9, PageID# 1111.) Specifically, Ms. Klemy contends that the ALJ improperly cast her mental health treatment as "conservative" and stated that her symptoms were well controlled, conclusions that she says are inconsistent with the record and with the ALJ's acknowledgement of "the need for increased medication dosages and ongoing counseling." (ECF No. 9, PageID# 1112.)

The ALJ found moderate limitations in Ms. Klemy's ability to understand, remember, and apply information; to interact with others; to adapt and manage herself; and to concentrate, persist, and maintain pace. (Tr. 20–21.) In coming to these conclusions, the ALJ acknowledged Ms. Klemy's reports of mood symptoms, sleep problems, fatigue, chronic pain, depression, irritability, and anxiety. (*Id.*) The ALJ also acknowledged that mental status examinations have revealed a depressed, anxious mood and abnormal affect. (*Id.*) But the ALJ accurately noted that Ms. Klemy has been consistently alert and oriented on examination, with normal speech, thoughts, perceptions, and memory, appropriate language, and adequate fund of knowledge. (*Id.*) The ALJ further noted, accurately, that Ms. Klemy is able to drive, read, attend appointments, drive her wife

20

to the store, and play video games. (*Id.*) The ALJ also noted, accurately, that Ms. Klemy consistently presented to appointments with intact attention and concentration, normal speech, and normal thought processes. (*Id.*)

> Ms. Klemy's complaint about the ALJ's reasoning seems to relate to this statement:
>
>> The behavioral health record is likewise limited and conservative. The claimant's mental impairments are treated with individual counseling and psychotropic medications prescribed on an outpatient basis . . . .

(Tr. 28.)

But, as she seems to acknowledge, the ALJ specifically noted that Ms. Klemy "has remained symptomatic" even with treatment, which treatment required "frequently increased medication dosages" and ongoing counseling. (*Id.*) The ALJ accurately noted that Ms. Klemy endorsed some improvement with this treatment and did not seek out further mental health treatment in an inpatient facility. (*Id.*)

The Court finds no reversible error in the ALJ's reasoning or conclusions in this regard. Ms. Klemy's argument that the ALJ's reasoning "downplays" her mental health symptoms is, at heart, a request to reweigh the evidence. But courts in this Circuit are generally skeptical of arguments that an ALJ "cherry picked" the record for evidence supporting the ALJ's conclusion. As the Sixth Circuit has stated, "claims that the ALJ 'cherry-picked' the record are 'seldom successful' because they essentially amount to a request that the court 're-weigh record evidence,' which [a court] may not do." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)); *see also White*, 572 F.3d at 284 (noting that accusations of cherry picking "can be described more neutrally as weighing the evidence").

21

Moreover, here the ALJ specifically referenced Ms. Klemy's testimony about her symptoms and accurately summarized her treatment history. The ALJ cited medical records showing that Ms. Klemy's symptoms persisted despite treatment and required medication changes. But the ALJ also, accurately, found that Ms. Klemy's mental status examinations revealed "generally mild to at most moderate psychiatric abnormalities." (Tr. 28.) And the ALJ acknowledged Ms. Klemy's activities of daily living, which, though limited, could support a conclusion that Ms. Klemy's mental health conditions do not prevent her from completing routine, simple tasks in a position that requires no more than occasional interaction with the public and only occasional routine workplace changes.

Thus, the ALJ discussed both positive and negative evidence regarding Ms. Klemy's mental health impairments, concluding that those impairments placed limitations on her ability to work, but that they were not so severe as to render her disabled. Ms. Klemy believes that the ALJ should have relied more heavily on evidence supporting her position. As noted above, however, the Court may not overturn the ALJ's decision merely because evidence in the record would have supported a different conclusion, so long as the ALJ's decision is supported by substantial evidence. *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's RFC here. Accordingly, Ms. Klemy's first assignment of error is overruled.

### 2.      Evaluation of Ms. Klemy's Pain and Other Symptoms

In her second assignment of error, Ms. Klemy argues that the ALJ failed to properly evaluate her description of her pain and other symptoms, in violation of Social Security Ruling 16-3p. (Pl.'s Br. at 13, ECF No. 9, PageID# 1114.)

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines

whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id*. If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id*. at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id*. at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id*. at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge

the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

Ms. Klemy acknowledges that the ALJ recognized that her impairments could reasonably cause her symptoms, but she says that "the ALJ failed to connect the evidence to the functional limitations caused by those symptoms." She argues that the ALJ "merely recited selective portions of the record without providing the detailed, reasoned analysis required under SSR 16-3p."

This is, again, a straightforward "cherry-picking" argument. While Ms. Klemy points to evidence in the record that she believes should have supported a different result, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Here, the ALJ accurately and thoroughly summarized the treatment record and discussed Ms. Klemy's activities of daily living in conjunction with the objective medical evidence. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1006 (6th Cir. 2025) (no reversible error where the ALJ relied on the claimant's activities of daily living and "carefully analyzed the entirety of

24

the record evidence regarding [claimant's] ability to function, using [claimant's] statements regarding her activities only as one factor among many"); *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *8-9 (N.D. Ohio June 16, 2022) (holding that ALJ did not err in relying on claimant's reports of daily activities in conjunction with objective medical evidence).

As the Commissioner points out, the ALJ acknowledged Ms. Klemy's complaints and testimony regarding depression, anxiety, irritability, sleep difficulty, fatigue, decreased concentration, memory deficits, frequent bathroom usage, chronic pain, difficulty using her hands, and the need to use a cane and wheelchair. (Tr. 19–28.) The ALJ characterized Ms. Klemy's activities of daily living as "relatively limited" and noted that she reported being unable to shop in stores, cook, do laundry, or independently perform some ADLs. (Tr. 20–23, 27).

The ALJ then considered the objective medical evidence, thoroughly summarizing her medical imaging, lab results, physical examination findings, and mental status examination findings—noting both abnormal and normal findings (Tr. 23–27). The ALJ accurately noted that medication improved Ms. Klemy's symptoms—both physical and mental—but did not eliminate those symptoms entirely.

In short, the ALJ's analysis was sufficient to satisfy SSR 16-3p. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 2026 WL 261558 (Feb. 2, 2026) (ALJ complied with SSR 16-3p where the ALJ thoroughly and accurately summarized the claimant's allegations and testimony, then reasonably found that those allegations were not fully supported, discussing and reasonably weighing the record evidence). Notably, beyond pointing to evidence that Ms. Klemy wishes the ALJ had weighed differently, Ms. Klemy does not suggest any specific functional limitation that she would

have had the ALJ include in the RFC. Accordingly, Ms. Klemy's second assignment of error is overruled.

### 3.      Evaluation of Sustainability

In her third assignment of error, Ms. Klemy argues that the ALJ failed to account for the issue of sustainability in her RFC. (Pl.'s Br. at 15, ECF No. 9, PageID# 1116.)

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

> Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

SSR 96-8p, 1996 WL 374184 at *2 (July 2, 1996) (emphasis in original).

Here again, Ms. Klemy acknowledges that the ALJ found severe impairments. But she argues that the ALJ did not adequately consider how her chronic pain—compounded with her mental health conditions—would affect her ability to sustain work activity on a regular and continuing basis.

But Ms. Klemy does not identify any opinions from a medical source assessing a functional limitation more limited than the RFC. She points to no medical opinion, for example, that she would be chronically absent or off task. *See Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-1849,

26

2021 WL 4987607, at *3 (N.D. Ohio Oct. 27, 2021) ("It is plaintiff's burden to prove the severity of her impairments, and to provide evidence establishing her RFC.")

The finding of a medically determinable impairment—even a severe one—does not automatically mean that a claimant has resulting functional limitations in their ability to work. *See e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work."). Further, "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n.7 (S.D. Ind. July 9, 2019)).

Ms. Klemy's argument that the ALJ provided "no specifics and little discussion of the evidence" is flatly contradicted by the ALJ's decision. The ALJ amply and carefully discussed all the records related to Ms. Klemy's conditions throughout the relevant period. The ALJ discussed test results, imaging, the consulting examiner's opinion, Ms. Klemy's counselor's notes, physical and mental status examinations, and other records. In other words, the ALJ considered the medical and non-medical sources in the record.

After careful consideration, the Court is convinced that the ALJ's conclusion that Ms. Klemy can sustain work activity on a continuing basis was supported by substantial evidence, that is "'such relevant evidence as a reasonable mind might accept as adequate to support'" the ALJ's conclusions. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant'' position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, the ALJ acknowledged Ms. Klemy's statements about her limitations, thoroughly and accurately summarized the treatment record, reasonably explained how the record partially contradicted Ms. Klemy's description of her limitations, and reasonably concluded that Ms. Klemy remained capable of sustained work activity under the limitations set forth in the RFC. The ALJ's conclusion regarding sustained work activity was supported by the opinions of the state agency medical and psychological consultants. Under these circumstances, and where Ms. Klemy points to no medical opinion establishing a greater limitation with respect to sustainability, the Court cannot find reversible error in the ALJ's conclusions. Accordingly, Ms. Klemy's third assignment of error is overruled.

## VI.      CONCLUSION

Having overruled Ms. Klemy's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated: <u>April 13, 2026</u>                                        /s/ *Jennifer Dowdell Armstrong*
                                                                                     Jennifer Dowdell Armstrong
                                                                                     U.S. Magistrate Judge